**2026 UT App 109**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
TREVOR ALEXANDER MARX,
Appellant.

Opinion
No. 20230044-CA
Filed July 23, 2026

Fifth District Court, St. George Department
The Honorable Jeffrey C. Wilcox
No. 191502062

Staci Visser and Ann Marie Taliaferro,
Attorneys for Appellant

Derek E. Brown and Karen A. Klucznik,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES GREGORY K. ORME and JOHN D. LUTHY concurred.

OLIVER, Judge:

¶1 A jury convicted Trevor Alexander Marx of one count of sodomy upon a child and one count of tampering with a witness. On appeal, he alleges the State failed to disclose favorable and material evidence and his attorney (Counsel) rendered ineffective assistance in multiple ways. He also requests we remand his case to the district court to develop the record regarding one of his claims. We are unpersuaded by his arguments and thus affirm his convictions and deny his request.

## BACKGROUND[1]

### *The Abuse*

¶2　Marx married his first wife (Mother) in October 2005, and their daughter Taylor[2] was born in April 2006. At the time, the family lived in St. George, Utah, and Marx cared for Taylor during the day while Mother worked. At the first house Taylor recalled living in with her parents, Marx "put . . . chocolate sauce on his penis, and he told [her] to lick it off." Taylor did so because Marx "told [her] to" and because she "trusted" her father. Marx and Mother separated when Taylor was approximately eighteen months old, and the two began living separately, with Taylor spending half of her time with each parent.

¶3　Marx and Mother eventually divorced when Taylor was "around the age [of] 4 or 5." Marx moved to Layton, Utah, shortly thereafter, in June 2010, seeing Taylor only on weekends and during the summer. After the move, there were multiple instances where Marx would "get on top of [Taylor]" and make her "kiss him in intimate ways." Specifically, he would "[F]rench kiss [Taylor], and he would expect [her] to do it back." The abuse stopped when Taylor was about eight years old.

### *The Disclosure and Investigation*

¶4　In 2019, thirteen-year-old Taylor disclosed to Mother that Marx had done "some really, really bad things" to her. At this point, the abuse was "affecting [her] mentally and physically," and she had "kind of developed [an] eating disorder because of it." The next morning, Mother took Taylor to the police station to report the abuse. Mother discussed the disclosure with a detective

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Maese*, 2010 UT App 106, n.2, 236 P.3d 155.

2. A pseudonym.

(Detective) and told him that she had previously asked Taylor "several times" whether Marx had abused her. She explained that she had spoken to Marx's second ex-wife (Ex-wife) the previous day and that "[e]very time" she spoke to Ex-wife on the phone, Ex-wife asked if Mother was sure "that [Marx] ha[d]n't done anything with [Taylor]." Mother told Detective that based on her "weird gut feeling" after that particular phone call, she again asked Taylor if Marx had "done anything inappropriate with" her, and Taylor "finally" disclosed the abuse. Detective then set up an interview for Taylor at the Children's Justice Center (CJC).

¶5     As part of the investigation, police had Taylor make a recorded pretext call to Marx (the Pretext Call). When Marx answered, he sounded relaxed and happy to talk to Taylor. Then Taylor said Mother had put her in counseling and she was being asked whether Marx had ever done anything inappropriate with her. Taylor expressed that she did not know what she should do. Marx's tone shifted, and he replied, "You should just answer how you feel, kiddo."

¶6     Taylor pressed further, asking, "[L]ike what do I do?" Marx initially responded, "I cannot answer that question for you what you do, okay?" He then asked, "But is anybody else there?" After Taylor confirmed she was the only person on the call, Marx said, "Well, I mean I would prefer you not say anything about anything . . . . Obviously. But that's up to you, kiddo."

¶7     Marx shifted the conversation, and the two briefly discussed other topics. Marx then asked Taylor if she was okay, and she replied, "I was just nervous, and I didn't know what to tell them." Again Marx responded, "Well, like I said, you tell them what you want, but I'd prefer you not." He continued to explain, saying, "I could get into a lot of trouble, you know?"

¶8     Marx then asked Taylor what she had told the counselor so far. She said, "I haven't really told them anything," and she reiterated she had just begun meeting with the counselor when these questions had come up. Marx then replied, "Okay. Well, okay. Like I said, it's up to you as to what you—what you answer

on that, but I would prefer not." At this point, his tone became more serious and he said, "Listen, I can get into a lot of trouble." Marx and Taylor then discussed one of Taylor's school classes before concluding the call.

¶9     Detective later called Marx to inform him of Taylor's allegations.[3] Marx's initial response was to ask when Taylor alleged the abuse occurred. When Detective asked him why he was asking about the time frame of the abuse, Marx "indicated that he very rarely saw" Taylor. Eventually, Marx denied the allegations and claimed he had never been alone with Taylor. Detective also asked Marx about his repeatedly telling Taylor on the Pretext Call that he would prefer she not say anything because he could get in trouble. Marx explained he made these comments because he would get in trouble if Taylor claimed he had touched her. Marx was not "angry" during the call with Detective, but he was "matter of fact" and "put off."

¶10    Marx was later charged with one count of sodomy upon a child and one count of tampering with a witness.

*The Trial*

¶11    At trial, Taylor testified about the abuse described above. She also recalled additional details related to the abuse. Specifically, Taylor testified about the house in St. George where the abuse began, including the color and layout of the house, the location of the bed in her bedroom, and a mural painted on her bedroom wall. She also recalled that during the abuse, Marx was on her bed and was wearing a shirt "but no pants." Similarly, she recounted details of the house in Layton and the room where the other abuse occurred. She also testified that she had not disclosed the abuse earlier because Marx "used to tell [her] . . . that if [she]

---

3. Detective's phone call with Marx was not played during trial or made part of the record on appeal. Detective testified to the contents of the phone call during his trial testimony.

said anything, he would go to jail." During her testimony, the State played the audio of the Pretext Call.

¶12 The State also called Mother to testify. She discussed the "contentious and rocky" nature of her relationship with Marx, admitting that the two "were fighting all the time" and "[t]here was a lot of contention between the two of [them] leading up to and during the divorce." She testified this dynamic remained even after the divorce, with "heated" communications continuing between the two, including about child support and custody. She also testified she had told Marx that her new husband wanted to adopt Taylor.

¶13 Detective testified regarding both the Pretext Call and his telephone conversation with Marx.

¶14 At the close of the State's case, Marx moved for a "judgment of acquittal." The court denied the motion. The defense then called a trained child forensic interviewer (Expert) as an expert witness. During Expert's testimony, the defense played the entirety of Taylor's CJC interview. Expert then testified regarding memory contamination, saying it can occur when someone improperly influences a child's memories of events through improper questioning. Expert expressed concern that some of the conversations Mother had with Taylor could have resulted in memory contamination. Expert also testified regarding source monitoring, which she said refers to the ability to monitor "the information that's coming" in. She testified that this skill is "poorly developed in young children" and, as a result, children end up incorporating "outside information" "into their story." She stated that comments Mother had made to Taylor regarding Marx being "mean" and "violent" could have influenced Taylor's memory and recounting of events.

¶15 Marx then testified in his own defense. He corroborated much of the previous testimony, including when he lived in St. George, when he moved to Layton, and the contentious nature of his and Mother's relationship. Marx testified that from the time Taylor was born until he moved to Layton, he was never alone

with her at the St. George house. And when Counsel asked how certain he was about that, Marx testified he was "[v]ery certain." He testified that he told Detective he thought Taylor was "making it all up." And Marx said that during the Pretext Call, he did not challenge the notion that he had done inappropriate things with Taylor because he did not "see fit to have a conversation with her that [he] had just had two weeks prior about lying." In response to a written question from a juror, Marx confirmed his claim was that he never spent time alone with Taylor between 2006 (when she was born) and 2011.

¶16   Marx also testified that he is allergic to chocolate. He said he discovered this allergy when he was ten years old, explaining that after eating a piece of chocolate his "tongue began to tingle, and it got swollen, and then [he] vomited." He further testified that on an occasion where chocolate spilled on his hand, it became "itchy and swollen and red within minutes." He testified that he carried an Epipen with him because of this allergy.

¶17   Finally, the defense called Marx's father as a witness. He testified that when Marx was ten years old, Marx "immediately began to throw up and gasp" after eating some chocolate. He testified that he was also allergic to chocolate, as was his father, Marx's grandfather. He described this allergy as "severe" and recounted Marx's grandfather having "a hard time breathing" "if he ate chocolate or had contact with chocolate." He described Marx's reaction as "more severe" than Marx's grandfather's.

¶18   The State then called a rebuttal expert. She agreed with Expert that memory contamination can occur when young children are improperly questioned, but she said this was "not absolute." She also testified that while young children have difficulty with source monitoring, a thirteen-year-old would be able to reliably source monitor. Specifically, she testified that she did not have any concerns about source monitoring based on Taylor's CJC interview because Taylor was able to convey where she got her information.

¶19    Following closing arguments, the jury deliberated and found Marx guilty as charged.

*The Post-trial Motion*

¶20    Before sentencing, Marx obtained new counsel. He then submitted supplemental requests for discovery seeking the body camera footage from Mother's conversation with police when she reported the abuse and a copy of a report from Taylor's physical examination by Safe and Healthy Families (the SHF report). As part of his request, Marx acknowledged that a report previously provided to Counsel had a "yes" mark indicating that the State had body camera footage of Mother's initial interaction with police.

¶21    Marx later submitted a motion to arrest judgment or for a new trial. In his motion, Marx argued the State violated its duty to disclose the body camera footage and the SHF report and Counsel rendered ineffective assistance in failing to present medical evidence showing Marx is allergic to chocolate and not investigating the case to discover evidence with which to impeach Taylor and Mother. Following a hearing on the motion, the court denied it. Marx was sentenced to twenty-five years to life for sodomy upon a child and zero to five years for witness tampering, with the sentences to run concurrently.

ISSUES AND STANDARDS OF REVIEW

¶22    Marx first appeals the district court's denial of his motion for a new trial based on the claim that the State violated its duty to disclose the body camera footage and the SHF report. "We review a court's ruling on a motion for a new trial for an abuse of discretion." *State v. Aguilar*, 2022 UT App 97, ¶ 10, 516 P.3d 768 (cleaned up).

¶23    Marx next asserts he received ineffective assistance of counsel. First, he argues in the alternative to the above argument that Counsel was ineffective for failing to obtain and use the body

camera footage and the SHF report. Second, Marx argues that Counsel rendered ineffective assistance by failing to put on additional evidence of Marx's asserted chocolate allergy. "When we are presented with a claim of ineffective assistance of counsel [that was addressed below], we review a lower court's purely factual findings for clear error, but we review the application of the law to the facts for correctness." *State v. Ray*, 2020 UT 12, ¶ 23, 469 P.3d 871 (cleaned up).

¶24   Finally, Marx requests we remand his case under rule 23B of the Utah Rules of Appellate Procedure to supplement the record with evidence from "a qualified forensic expert that could opine on issues of memory, child development, and . . . false allegations of sexual abuse." Such a remand is "available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a).

ANALYSIS

I. Body Camera Footage and SHF Report

¶25   Marx claims the district court abused its discretion in denying his motion for a new trial because the State's failure to disclose the body camera footage and the SHF report violated his due process rights and the State's disclosure obligations. *See Brady v. Maryland*, 373 U.S. 83 (1963); Utah R. Crim. P. 16. "To establish a *Brady* violation, a defendant must show (1) that the prosecution suppressed evidence, (2) that the evidence is favorable to the accused, and (3) that the evidence is material to either guilt or to punishment." *Carter v. State*, 2025 UT 13, ¶ 73, 570 P.3d 315 (cleaned up). Evidence is considered material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* ¶ 97 (cleaned up). The "materiality of suppressed evidence must be evaluated in the context of the entire record."

*Tillman v. State*, 2005 UT 56, ¶ 32, 128 P.3d 1123. Thus, we weigh "the cumulative or collective effect of the evidence" in "determining whether the disclosure would have created a reasonable probability of a different result." *Id.* Doing so here, we conclude the evidence is not material and, as a result, Marx's *Brady* claim fails.

¶26 Marx argues the body camera footage was not only favorable to him but also material because it showed that Mother had repeatedly asked Taylor if he had sexually abused her and Taylor had repeatedly denied any abuse. He asserts this would have bolstered his argument that Taylor's eventual disclosures were contaminated by Mother's repeated questioning about abuse. But Marx fails to acknowledge that while this evidence may have been favorable to him when viewed in one light, it could have harmed his defense as well. The reason Mother gave for repeatedly asking Taylor about potential abuse was Ex-wife repeatedly expressing her concerns to Mother regarding Marx's "weird" behavior toward Taylor. So while Mother's repeated questions to Taylor may have benefited Marx's defense, the reason for her actions would likely have negated this benefit.

¶27 Regarding the SHF report, Marx argues it corroborates Mother's repeated questioning of Taylor and also indicates no physical injuries to Taylor were discovered. Although Marx acknowledges that the SHF report highlights that the type of abuse Taylor alleged, combined with the length of time since the abuse occurred, made any physical evidence unlikely, he argues that Mother having Taylor undergo a physical examination demonstrates the motivations of Mother to harm Marx and undermines the credibility of Taylor's allegations. We do not agree that the mere fact that Taylor underwent a physical examination would have helped Marx to discredit Taylor's allegations of abuse. At best, the examination shows that there were no recent injuries. But, as Marx admits, that would not be surprising because Taylor testified that the abuse ended when she was eight years old, five years before she reported the abuse to Mother and underwent the examination. And Mother scheduling

a medical examination while they were at the CJC for Taylor's interview just as easily demonstrates Mother's willingness to comply with a full investigation as it does a nefarious purpose, particularly where the examination was not likely to—and, in fact, did not—provide any evidence to corroborate Taylor's allegations. So, the SHF report would not have been favorable to Marx's defense.

¶28    Moreover, weighing the cumulative effect of the disclosure of the body camera footage and the SHF report, we conclude that their disclosure would not have created a reasonable probability of a different result. Marx asserts this evidence would have made a difference in the verdict because this was "a credibility case." But it was not simply a he said/she said case. In addition to testimony from Taylor and Marx, the jury had before it the Pretext Call and Detective's testimony about his call with Marx. Both calls created credibility problems for Marx that the body camera footage and the SHF report could not overcome. In the Pretext Call, after Marx responded to Taylor's question about what to tell the counselor he brought it up two more times. Indeed, Marx told Taylor three separate times that he would "prefer [she] not" tell her counselor anything, and told her twice that he could "get into a lot of trouble" if she did. Marx never denied that something happened. The jury heard the audio of this call, including the shift in Marx's tone when telling Taylor he would get in trouble if she said anything.[4] And in the call with Detective, Marx responded to the allegations not with an immediate denial but by repeatedly asking when the abuse allegedly happened because "he wasn't around her that often." Detective testified that it was not until later in the phone call that Marx denied the abuse, and Detective also described Marx's demeanor as "matter of fact" and "put off" rather than "angry." Moreover, even though Detective described the allegations concerning "the chocolate sauce," Marx never mentioned to Detective that he had a chocolate allergy.

---

4. We reviewed the audio recording of the Pretext Call ourselves and noted the shift in Marx's tone.

¶29 Additionally, Marx's testimony at trial undermined his own credibility. He testified on direct examination that he was never alone with Taylor from the time she was born until he moved to Layton. Asked by Counsel how sure he was about his testimony, Marx testified that he was "[v]ery certain." At the conclusion of his testimony, a juror asked in a written question: "Mr. Marx, is it your claim that you never spent time alone with your daughter between the years 2006 and 2011?" Marx responded, "That is true. That's my claim." Marx's insistence that he never spent any time alone with his young daughter over a five-year period that included when he stayed home to care for her after she was born as well as a years-long stretch thereafter where she lived with him about half the time likely left the jury with doubts as to his credibility that neither the body camera footage nor the SHF report could have mitigated.

¶30 We conclude there was not a reasonable probability the outcome at trial would have been different and, thus, the evidence was not material. Accordingly, the district court did not abuse its discretion in denying the motion for a new trial.

## II. Ineffective Assistance of Counsel

¶31 Marx presents two claims of ineffective assistance of counsel. First, he argues as an alternative to his *Brady* claim that Counsel was ineffective for failing to obtain the body camera footage and the SHF report and use them at trial. Second, he argues that Counsel was ineffective for failing to present evidence of his chocolate allergy.

¶32 "To prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense." *State v. Miller*, 2023 UT App 85, ¶ 25, 535 P.3d 390 (cleaned up); *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. To

establish prejudice, "a defendant must present sufficient evidence to support a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Archuleta v. Galetka*, 2011 UT 73, ¶ 40, 267 P.3d 232 (cleaned up). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Carranza*, 2023 UT App 72, ¶ 42, 533 P.3d 850 (cleaned up). "A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *Miller*, 2023 UT App 85, ¶ 25 (cleaned up). Here, both of Marx's claims fail for lack of prejudice.

A.     Body Camera Footage and SHF Report

¶33     Marx asserts that even if there was no violation of the State's duty to disclose evidence, Counsel rendered ineffective assistance by not requesting the body camera footage and the SHF report and using them at trial. But even if we assume, without deciding, that Counsel performed deficiently, Marx has failed to demonstrate the required prejudice.

¶34     The prejudice analysis for ineffective assistance is the same as the materiality analysis for a *Brady* violation; both require us to consider whether there is a reasonable probability that the outcome at trial would have been different without the asserted error. *Compare Archuleta*, 2011 UT 73, ¶ 40 (providing that to establish prejudice for ineffective assistance of counsel, "a defendant must present sufficient evidence to support a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (cleaned up)), *with Carter v. State*, 2025 UT 13, ¶ 97, 570 P.3d 315 (stating that evidence is material for purposes of a *Brady* violation "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different" (cleaned up)). Because we have already concluded the body camera footage and the SHF report were not material, *see supra* Part I, we also conclude Marx was not prejudiced by Counsel's failure to obtain and use them at trial. Accordingly, this claim of ineffective assistance of counsel fails.

B.     Medical Evidence of Marx's Allergy

¶35     Marx also claims Counsel rendered ineffective assistance by "failing to investigate and use medical evidence supporting Marx's allergy/sensitivity to chocolate." Marx points to specific evidence he provided to Counsel—namely, a self-conducted experiment where Marx poured melted chocolate on his hand and photographed it, and the results of a physician-administered skin-prick test—as the evidence Counsel should have used at trial. Marx also argues Counsel should have called an expert medical witness to testify regarding the allergy. However, we conclude that even if we assume Counsel performed deficiently by not presenting evidence of this type at trial, it did not prejudice Marx.

¶36     First, we address the evidence Marx provided Counsel concerning his chocolate allergy—the self-conducted experiment and the skin prick test. In his allergy experiment, Marx poured "a large . . . portion of melted chocolate on the back of his hand" and photographed the results. The pictures show the skin on the back of his hand was red, irritated, and slightly bruised. Marx admitted to washing his hand and scratching it "with some vigor" following the experiment but before the pictures were taken and before any medical evaluation of the sensitivity was done. And the physician's report of Marx's skin prick test indicated only a "sensitivity to chocolate" and stated further testing was necessary to conclusively diagnose an allergy.

¶37     This evidence not only fails to indicate a severe reaction, it also undermines the testimony Marx and his father offered at trial. Marx testified he experienced symptoms of anaphylaxis when he ate chocolate as a child and he carries an Epipen due to the severity of his allergy. Marx's father similarly testified to a family history of chocolate allergies with severe reactions and described Marx's reaction as being the most severe in three generations. In contrast, the self-conducted test and skin prick test showed only mild skin irritation. Because of this, we conclude Marx was not prejudiced by Counsel's failure to present this evidence at trial.

¶38　Second, we address the lack of an expert witness regarding Marx's allergy. Marx faults Counsel for "failing to present a medical expert" to confirm his chocolate allergy and its severity, but he "has not identified any medical expert who would have testified on [his] behalf at trial or set forth that expert's expected testimony in the record." *State v. Gerber*, 2015 UT App 76, ¶ 14, 347 P.3d 852.[5] It is therefore unknown whether Counsel would have been able to find an expert willing and available to corroborate Marx's and his father's testimony regarding the existence and severity of Marx's asserted chocolate allergy. "Accordingly, any argument that more investigation would have resulted in useful expert testimony is speculative and not sufficient to show a reasonable likelihood of a more favorable outcome for" Marx. *See State v. Suhail*, 2023 UT App 15, ¶ 124, 525 P.3d 550.

¶39　Thus, Marx has failed to demonstrate that Counsel provided ineffective assistance regarding his chocolate allergy.

### III. Rule 23B Remand

¶40　The Utah Rules of Appellate Procedure allow defendants to "move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of ineffective assistance of counsel." Utah R. App. P. 23B(a). "Defendants seeking to develop an ineffective assistance of counsel claim through a rule 23B motion face a high bar." *State v. Samora*, 2023 UT 5, ¶ 19, 529 P.3d 330. We grant such a motion only "upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a).

¶41　Marx asserts Counsel provided ineffective assistance by not consulting with and calling "a qualified forensic expert that

---

5. Marx did not request a remand under rule 23B of the Utah Rules of Appellate Procedure to more fully develop the record on this point.

could opine on issues of memory, child development, and . . . false allegations of sexual abuse." He has provided the declaration of an expert witness (New Expert) containing the testimony New Expert would have offered at trial on these issues, including (1) that episodic memory "has not been proven to exist in humans in any measurable capacity prior to the age of 4"; (2) that "[i]t's generally understood in the forensic and clinical psychology community that 3–5 year old children have no capabilities to form and accurately retain episodic memories or they have limited functions which should not be relied upon without independent corroboration"; and (3) that "[i]t is common knowledge in the forensic and clinical psychology research community that false allegations of sexual abuse can occur at a higher frequency during contentious divorce proceedings."

¶42 When analyzing whether Marx has carried his burden of demonstrating ineffective assistance of counsel to warrant a rule 23B remand, this court conducts "a counterfactual analysis—we contemplate what would have happened but for the ineffective assistance." *Samora*, 2023 UT 5, ¶ 22 (cleaned up). "In making this determination, we consider the totality of the evidence, taking into account such factors as whether the errors affect the entire evidentiary picture or have an isolated effect and how strongly the verdict is supported by the record." *Id.* (cleaned up). Here, even accepting Marx's contention that Counsel performed deficiently by not calling New Expert, he has failed to show that he was prejudiced.

¶43 Marx asserts that "[t]his case was a credibility case" and that New Expert's testimony would have sufficiently undermined Taylor's credibility such that "at least one juror would had altered their conclusion in this case." But when we consider the totality of the evidence before the jury, there is not a reasonable probability that the addition of New Expert's testimony would have resulted in a different outcome.

¶44 First, as explained, *see supra* ¶¶ 28–29, the evidence at trial went beyond the testimony of Taylor and Marx. The jury heard

the recording of Marx's statements to Taylor in the Pretext Call, Detective's testimony about his phone call with Marx, and Marx's testimony at trial. And at least one juror directly questioned Marx's dubious claim that he had never been alone with Taylor from the time of her birth in 2006 until 2011. All this evidence—at a minimum—created credibility problems for Marx's defense that New Expert's testimony would not have overcome.

¶45 Second, New Expert's proposed testimony about childhood memory could not explain why Taylor was able to recall the details about the house in St. George—its color, the layout, the location of her bed in her bedroom, and the specific mural painted on the wall in her bedroom—but would not also be able to recall that Marx made her lick chocolate off his penis in that same house.[6] Indeed, New Expert's declaration merely indicated that "[m]emories from a very young age *may* not be accurately retrieved or recalled." (Emphasis added). Thus, New Expert could not have testified that Taylor's memory from that age was necessarily fabricated.

¶46 Finally, New Expert's testimony that it is "common general knowledge in the forensic and clinical psychology research community that false allegations of sexual abuse *can* occur at a higher frequency during contentious divorce proceedings" (emphasis added) would likely not have been significant to the jury. After all, New Expert's testimony would support only the *possibility* that false allegations occur at a higher frequency in cases where there is a high-conflict divorce; he did not provide any specific percentages or otherwise quantify the frequency. And in any event, the fact that false allegations can possibly occur more often in cases where there is a contentious divorce is likely understood by the average juror.

---

6. Given that Marx made no attempt to contradict Taylor's testimony regarding the details of the house, the jury would likely have inferred that her recollection was correct.

¶47   In sum, we do not believe New Expert's proposed testimony would have created a reasonable likelihood of a different result for Marx, and we accordingly deny his request for a remand.


CONCLUSION

¶48   The district court did not abuse its discretion in denying Marx's motion for a new trial because the failure to provide the body camera footage and the SHF report was not a *Brady* violation. And each of Marx's ineffective assistance claims fails because he cannot demonstrate prejudice. Finally, we deny his motion for a rule 23B remand because he cannot demonstrate that Counsel was constitutionally ineffective.

————————